IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 7, 2013

## IN RE: REBECCA J.R.M.

**Appeal from the Juvenile Court for Knox County**
**No. 123417       Tim Irwin, Judge**

**No. E2013-00996-COA-R3-PT-FILED-DECEMBER 12, 2013**

The State of Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of Christopher W.C. ("Father") to the minor child Rebecca J.R.M. ("the Child").  After a trial, the Juvenile Court entered its judgment finding and holding, *inter alia*, that clear and convincing evidence was proven that grounds existed to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. §§ 36-1-113 (g)(2) and (g)(9)(A), and that clear and convincing evidence was proven that it was in the Child's best interest for Father's parental rights to be terminated.  Father appeals to this Court.  We affirm the termination of Father's parental rights to the Child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, and THOMAS R. FRIERSON, II, JJ., joined.

Robin Gunn, Knoxville, Tennessee, for the appellant, Christopher W.C.

Robert E. Cooper, Jr., Attorney General and Reporter; and Jordan Scott, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

### OPINION

### Background

The Child was born in February of 2010 and was removed from her mother's custody in September of 2010 after the mother took the Child to Niswonger's Children's Hospital and it was discovered that the then seven month old Child had multiple fractures in various stages of healing.  Father already was incarcerated at that time.  The Child was found

to be dependent and neglected. The Child's mother surrendered her parental rights. DCS filed this suit in May of 2012 seeking to terminate Father's parental rights to the Child. The case was tried in March of 2013.

Father, who was twenty-three years old at the time, testified at trial. At the time of trial, Father was incarcerated at Northwest Correctional Complex in Tiptonville, Tennessee serving a sentence after pleading guilty to aggravated assault arising from an incident in August of 2008 when he pulled a gun on a girlfriend. Initially, Father had been placed on judicial diversion under probation in October of 2008. Father then was arrested in February of 2009 and charged with aggravated burglary. Because Father violated his probation, his judicial diversion was revoked. Father admitted that he pled guilty to the charge of aggravated burglary.

Father testified that he was living with his sister in the projects when the Child's mother became pregnant with the Child. He stated: "I really didn't find out she was pregnant until I was in jail, which - - then after then, I was kind of like on my way to prison, you know." Father admitted he never has seen the Child and stated: "she was born when I was at Northwest. I've never seen her face. I've never heard her voice. I've never held her hand." Father testified that the Child's mother visited him one time in jail before he was sentenced. Father stated that by the time of trial it had been a few years since he had seen the Child's mother or had any contact with her.

Father admitted that the Child's mother had told him she was pregnant with his child and stated:

> I didn't really know she was pregnant until they like really sentenced me. They was like, "Well, you're on your way to prison." So I'm waiting to go to prison, and I think [the Child's mother] come over there one time to see me. And she pretty much broke everything down to me of what was going on. . . . She just basically told me - - she's like, "well, you're going to be a father; I'm pregnant." She's like, "You got to do what you go [sic] to do to get out.

Father testified that he asked the mother to put his name on the Child's birth certificate, but she did not do so. Father also testified that he asked for a DNA test, but that he did not file a petition for paternity or put his name in the putative father registry.

Father admitted that someone from DCS visited him in prison in June of 2011 and went over the Child's permanency plan ("Permanency Plan") with him. Father testified that the only program available to him in prison is therapeutic community, which he stated is "like anger management, drug - - like rehabilitation. Drug program, anger management,

drug, community - - like - - like pre-release when they release you for the streets. And something else I can't remember." Father stated that after the visit from the DCS worker he signed up for therapeutic community. He stated:

> I've been on the register waiting to go, but there's like so many inmates there, and it's like a nine-month program. So I got to wait until a bed opens. Then the people that signed up before me, they got to go before I can. I'm on a waiting list. So I got to wait till my turn.

When questioned further, Father admitted that it was some time after DCS gave him the Permanency Plan before he even signed up for therapeutic community. He stated: "I kind of read [the Permanency Plan] and figured it out. It was sometime after that, like maybe a couple months afterwards or a month or something. I don't really remember. I know I've been on the registry for a long time now waiting to go." Father testified that he cannot just sign up for counseling, anger management, domestic violence classes, or alcohol and drug treatment. Father testified that the only program other than therapeutic community is a pre-release program that "just prepares you for the streets," that you take right before you get out.

Father admitted that he had incurred disciplinary infractions while in prison. When asked if he had more than five disciplinary infractions, Father stated: "Maybe, yeah." Father admitted that he was charged with vandalism for breaking a sprinkler head. When asked what else he got in trouble for Father stated: "Possession of a phone, possession of marijuana, and possession of a knife." Father admitted that he had been up for parole, but had been denied.

When asked if he could get into the therapeutic community program if he had disciplinary actions pending, Father stated:

> No, it's just a certain - - it's just like certain write-ups. It's like - - it's like the worst write-up you can get - - like you can have a B and a C and be on the waiting list, but I think it's an A that you can't have. . . . I've only had B's and C's. and I think I might have had a couple A's, but that was when I first come to prison. That's like way before when I first come to prison.

Father testified that he has not had an A write-up since he signed up for therapeutic community.

Father admitted that he had a disciplinary infraction for possession of a deadly weapon. He was asked how many times he received this infraction, and he stated: "I think I was - - I was caught with - - I was caught with a couple of them at one time, but they

charged me separate." Father admitted that he was charged with this infraction in May of 2010 and again in May of 2011, but claimed that "they come in my cell and found one in my cell, and there's two people in a cell. So pretty much when they find something in your cell, you both get charged with it." Father also admitted he was charged with tampering with security equipment. He testified:

> We went out for rec, and I didn't want to lock my door, so I put like a little cardboard on the door so it wouldn't shut. So then they come by and shut the door when I was outside, and it had the cardboard on there where it wouldn't shut, so they charged me with tampering with the security system.

Father denied being charged in prison more than one time for fighting. He claimed he had been charged only one time for fighting.

> Father was shown a copy of his disciplinary report, and he admitted that one page showed that Father's infractions were all A classifications, another page showed mostly A infractions, and a third page showed the same. Father was asked if he had received a lot of class A disciplinary infractions, and he stated:

> Not really, because like when I - - like - - it's kind of like a double-jeopardy because like when I first like went there, I wasn't going to school. If you don't go to school in the morning time, they'll write you up. Then, again, if you don't go in the evening, they'll write you up. So, basically, you're being charged for not going to school one time twice. So that's how most of them are on that. If you look at it, it says failure to participate. That was not going to school. So, basically, I was charged with two A's for one crime.

When asked Father admitted that the infractions for possession of a deadly weapon, possession of contraband, and possession of an intoxicant were not charges for failing to go to school.

> Father was asked if he lost good time when he committed these infractions, and he stated: "I mean, you lose like six days a month [for an A infraction], so that's really nothing." Father was asked how many six days a month he thought he had, and he stated:

> And like I told you before, these was like two for one. Basically, two A's for one charge. One day you get wrote up twice, so that makes it two A's. so, really, you got to break that down into half. And I ain't had no write-ups in years. I ain't gonna lie, when I first went to prison, I was young and dumb and wild. I really didn't care. I felt like I had nothing to lose, so I was just doing

-4-

whatever I wanted to do and breaking the system. I ain't gonna lie. I admit that. But in the past two years, I ain't been in no trouble.

Father admitted that he has no home for the Child and no ability to support the Child. Father was asked how far he got in school, and he stated: "Maybe like the tenth grade." When asked if he ever had maintained a job, Father stated: "No, I've never had a job. Well, I mean, I had a job once, but it was like a laborer - - like a laborer's finder." Father admitted that he never has had his own residence.

Father testified that he was unable to call the Juvenile Court to obtain an attorney and was unable to call DCS to check on the Child or even the status of this case. Father claimed that he was unable to make any calls from prison after the contraband cell phone was taken from him :

> Because it's like - - they got these blue phones, and it's like - - it's fifteen dollars a call to make it down here, and I ain't got no help from the streets. I ain't got no money for myself because they take all my money for child support and DNA. So everything I make the State takes, so I don't get nothing.

Father admitted that he still had charges pending against him and stated: "I do have four charges pending, which is driving on revoked license, criminal impersonation, class C narcotic, and loud exhaust, which is all misdemeanors, which I'm going to court and it's going to be all time served." Father testified that he has spoken to an attorney and stated:

> I filed for a fast and speedy trial, and they - - I mean, they told me to file for a fast and speedy trial to get me into court, and I've done that. And they told me that they got me on the docket, and they're going to write me back and let me know a week before my court date so they know that - - they can put the transport order in to come and get me. They're going to do it before I get out of prison so I ain't got to get out of prison and go back to jail.

Father was asked about the pending charges in Blount County and when those crimes occurred, and he stated: "Those was the reason I got arrested, and that's how I come to prison. Because I was on the run in Knoxville. Then I got pulled over and got arrested and went to Blount County." Father stated this happened before he went to prison.

Father was shown a document and asked to identify it, and he stated:

That's something that I filled out back in September because I thought I was coming back to court. They never come and got me. It's basically an affidavit from my lawyer for him to - - I got some codes and some laws in there for him to basically do everything that he can to try to keep my rights and my parental rights and do everything in the best interest of my child. . . . I'd like for it to be placed on the record permanent related to the case of my daughter. And I've got it notarized right here at the bottom.

David Hall, a team leader and supervisor of the FSW, testified that he first became acquainted with Father in October of 2006, when Mr. Hall was the county case manager. Mr. Hall explained that Father was assigned to Mr. Hall when Father came into State custody as a juvenile. Mr. Hall testified that Father began calling Mr. Hall from prison during Father's current incarceration instead of calling his current case manager. Father called Mr. Hall in September and October of 2011 and twice in August of 2012.

Father told Mr. Hall about the Child and the situation with DCS, and Mr. Hall testified that he gave Father some advice. He stated: "I told [Father] that he need to abide by all the rules of the prison, that he needed to work the permanency plan, the aspects on the plan, and that he needed to keep in contact with the FSW." Mr. Hall stated that he also "reminded [Father] that the FSW had told him way back early on in the case that he needed to contact Juvenile Court in order to ask for an attorney."

Father called Mr. Hall from a cell phone number and admitted to Mr. Hall that he was calling from a cell phone he was not supposed to have. Father asked Mr. Hall not to tell anyone about the cell phone "because [Father] didn't want the officials coming and busting up in his cell." Mr. Hall believed that the cell phone eventually was taken from Father because Father stopped calling Mr. Hall from that number. With regard to having a weapon in prison, Mr. Hall stated that Father told him: "Northwest Correctional Complex is the most dangerous prison in the State of Tennessee, and everyone up here has something to protect them, and I had something to protect myself."

Deborah Daugherty, the DCS family services worker for the Child, testified at trial. Ms. Daugherty met with Father in prison and went over with him the Permanency Plan created for the Child. The DNA testing that had been done before Ms. Daugherty met with Father showed that Father was the Child's biological father. The Permanency Plan required Father to take advantage of all alcohol and drug programs and domestic violence programs available to him during his incarceration. Ms. Daugherty stated:

-6-

I went over the permanency plan with him, what he needed to do. I also went over the criterion and procedures for terminating rights. I also went over the notification of equal access to services and grievance procedures. I also went over various things that he needed to do while he was in prison, such as take advantage of all the programs that were available.

Father told Ms. Daugherty he was participating in all of the available programs.

Ms. Daugherty also talked to Father about obtaining an attorney. She told Father to contact the Juvenile Court and that he could write to them and ask for an attorney if he could not call. Father has not kept in touch with Ms. Daugherty, but has been in touch with Ms. Daugherty's supervisor "off and on." Ms. Daugherty testified that the Child is in a prospective adoptive home.

The Child's foster father ("Foster Father") testified that the Child has been in his home since September of 2010. Foster Father's household consists of him, his wife, the Child, and occasionally his step-son "when he's home visiting." Foster Father testified about how the Child came into his home. He stated that he and his wife received a call while on vacation about the Child and some child abuse, and that he and his wife stopped and picked up the Child on their way back home from the vacation. Foster Father was asked about injuries the Child had suffered before coming into his home, and he stated: "Had fractured leg, fractured arm, had a burn on the bottom of her foot, black eye. If I'm not mistaken, seems like there was a fracture in her skull as well." The Child was seven months old at the time she came to Foster Father's home. Foster Father testified that the Child has recovered from those injuries, is on track developmentally, and has no continuing health problems. The Child calls Foster Father "Dad," or "Daddy." Foster Father testified that he and his wife are prepared to adopt the Child.

After trial the Juvenile Court entered its detailed Termination of Parental Rights and Final Decree of Guardianship on April 17, 2013 finding and holding, *inter alia*:

2. On the date of the child's removal, [Father] was in prison. On October 22, 2008, he had been placed on judicial diversion following entry of a guilty plea to the charge of aggravated assault arising from an incident on August 17, 2008, when he pulled a gun on a former girlfriend and threatened to shoot her. He failed to comply with the rules of probation and was arrested on February 18, 2009, after breaking into a residence, ransacking the place, and stealing a handgun before the owner returned and chased him off. He remained in jail until May 12, 2009, when he was released on bond, and then returned on September 18, 2009 until his sentencing on September 24, 2009.

At that time he entered a guilty plea to aggravated burglary. His judicial diversion and probation were revoked on the aggravated assault conviction and a sentence of three years imprisonment imposed. A sentence of three years imprisonment, to consecutively, was imposed on his conviction for aggravated burglary. This child was born on February 6, 2010. By then [Father] was in prison. He learned of the mother's pregnancy after he was already in jail. He urged the child's mother to put his name on the birth certificate but she refused to do so. He has never seen his daughter.

3. The child's Knox County case manager visited [Father] in person at Northwest Correctional Complex on June 14, 2011, after the child's case was transferred to Knox County. During that meeting she reviewed the permanency plan with [Father] and advised him that he would be expected to participate in and successfully complete any programs available to him during his imprisonment that would assist him in parenting this child, including programs to address substance abuse, domestic violence/anger management, parenting and mental health. He was also expected to cooperate with the rules of the facility to ensure his release at the earliest possible date. His responsibilities have not changed. The child's case manager advised him to write to this Court to request counsel to assist him while his child was in foster care.

4. [Father] has committed multiple infractions in prison, including possession of drugs, possession of a deadly weapon, possession and use of a cell phone, and failure to cooperate with drug screens. Possession of a deadly weapon is as serious as it gets on the inside. The Department presented documentation of infractions through June 2011 but none after that date. [Father] asserts that he was "young and dumb and wild" when he first entered prison and did whatever he wanted to do but that he matured and has not been in trouble in the last couple years. That is contradicted to some extent by the Department's supervisor who described phone calls from [Father] as recently as August 2012, made on a contraband cell-phone. [Father] insisted that he could not participate in any programs because there is only one program, Therapeutic Community, and he is on the waiting list. He agreed that serious infractions would delay his admission to treatment and would affect his eligibility for parole but insisted that only "A" disciplinary cases rose to that level and claimed he had no "A" disciplinary cases. The documentary evidence contradicted his claim; it was full of "A" cases. He had no explanation for his previous denial of parole. He claims he is a model prisoner now; he needed to be a model prisoner way before.

5. The petition in this cause was filed on May 31, 2012, almost a year after [Father's] meeting with the child's case manager. [The Child] was almost two years old. By then [Father] certainly knew he was the child's father. DNA testing had been completed and he was aware of the results before the case manager's visit the previous year. Yet he took no steps to establish a legal relationship with the child. [Father] asserts that he could not do anything to claim paternity because he was incarcerated. As evidenced by his participation in this case, [Father] is certainly capable of writing letters and filing pleadings. He asked the child's mother to put his name on [the Child's] birth certificate. When she refused, he did nothing more to assert his parental rights. Thus, when the Department's petition was filed he was still not the child's legal parent.

* * *

7. However, the Court does find, upon these facts, that:

a. [Father] failed to file a petition to legitimate the child within thirty (30) days after notice of alleged paternity by the child's mother.

b. [Father] has failed to manifest an ability and willingness to assume legal and physical custody of this child. He remains in prison with only his assertion that he will be released in the near future. He is certainly not able to assume custody of this child no matter how willing he may be. Parole is uncertain at best. The Court has no idea how long after that it would take [Father] to provide a suitable home. For children, time is of the essence.

c. Awarding legal and physical custody of the child to [Father] would pose a risk of substantial harm to the physical or psychological welfare of the child. [The Child] was seriously traumatized and abused as an infant. Her foster parents have nurtured her through her recovery and provided her with the security and stability that has allowed her to blossom and thrive. Removing her from that home to place her with [Father] would certainly risk everything.

8. The Court further finds that [Father] has failed to comply in a substantial manner with those reasonable responsibilities set out in the permanency plan related to remedying the conditions which necessitate foster care placement.

* * *

-9-

1. [Father] has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in his home. He has no home at this time; he remains in prison. Due to his own conduct, [Father] has not been able to maintain regular visitation or other contact with the child (whom he has never seen) and no relationship at all has otherwise been established between [Father] and the child. A change of caretakers and physical environment is likely to have a detrimental effect on the child's emotional and psychological condition.

2. The child's mother previously surrendered her parental rights.

3. The Department of Children's Services has made reasonable efforts toward achieving permanency for this child.

4. The child is entitled to a safe, secure and loving home. As noted above, she appears to have fully recovered from her traumatic injuries and is thriving in her prospective adoptive home. [Father] has never had a job; he has never had a home; he has completed nothing in prison (not even his GED) and he faces additional charges in another jurisdiction once he is released from his current incarceration. It would be devastating to this child to remove her from the only family she really knows.

5. It is, therefore, in the best interest of [the Child] and the public that all of [Father's] parental rights to this child be terminated and the complete custody, control., and full guardianship of the child be awarded to the State of Tennessee, Department of Children's Services, with the right to place her for adoption and to consent to such adoption *in loco parentis*.

(citations omitted). Father appeals to this Court.

## Discussion

Although not stated exactly as such, Father raises three issues on appeal: 1) whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(2); 2) whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(9)(A); and, 3) whether the Juvenile Court erred in finding that clear and convincing evidence existed that it was in the Child's best interest for Father's parental rights to be terminated.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear

and convincing evidence supporting any single ground will justify a termination order. *E.g.,* *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first consider whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(2). In pertinent part, Tenn. Code Ann. § 36-1-113(g) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

\* \* \*

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

Tenn. Code Ann. § 36-1-113(g)(2) (2010).

With regard to this issue, the Juvenile Court specifically found and held:

The child's Knox County case manager visited [Father] in person at Northwest Correctional Complex on June 14, 2011, after the child's case was transferred to Knox County. During that meeting she reviewed the permanency plan with [Father] and advised him that he would be expected to participate in and successfully complete any programs available to him during his imprisonment that would assist him in parenting this child, including programs to address substance abuse, domestic violence/anger management, parenting and mental health. He was also expected to cooperate with the rules of the facility to ensure his release at the earliest possible date.

\* \* \*

[Father] has committed multiple infractions in prison, including possession of drugs, possession of a deadly weapon, possession and use of a cell phone, and failure to cooperate with drug screens. Possession of a deadly weapon is as serious as it gets on the inside. The Department presented documentation of

-12-

infractions through June 2011 but none after that date. [Father] asserts that he was "young and dumb and wild" when he first entered prison and did whatever he wanted to do but that he matured and has not been in trouble in the last couple years. That is contradicted to some extent by the Department's supervisor who described phone calls from [Father] as recently as August 2012, made on a contraband cell-phone. [Father] insisted that he could not participate in any programs because there is only one program, Therapeutic Community, and he is on the waiting list. He agreed that serious infractions would delay his admission to treatment and would affect his eligibility for parole but insisted that only "A" disciplinary cases rose to that level and claimed he had no "A" disciplinary cases. The documentary evidence contradicted his claim; it was full of "A" cases. He had no explanation for his previous denial of parole. He claims he is a model prisoner now; he needed to be a model prisoner way before.

The evidence in the record on appeal shows that Father incurred five class A disciplinary infractions between the date that Ms. Daugherty visited him and went over the Child's Permanency Plan with him on June 14, 2011 and the end of June of 2011. Father testified that he signed up for therapeutic community, which he asserted was the only program available to him while in prison, but admitted that having class A disciplinary infractions could delay his acceptance into the therapeutic community program. Father also admitted that he did not sign up for the therapeutic community program as soon as possible after Ms. Daugherty explained to him his responsibilities under the Permanency Plan. Rather, Father testified that it was "sometime after [Ms. Daugherty met with him and went over the Permanency Plan with him], like maybe a couple months afterwards or a month or something . . ." before he signed up for therapeutic community. The evidence in the record on appeal does not preponderate against the findings made by the Juvenile Court by clear and convincing evidence that grounds were proven to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(2).

We next consider whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(9)(A). In pertinent part, Tenn. Code Ann. § 36-1-113 provides:

(9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person or, if no such petition is filed, at the time of the filing of a petition to adopt a child, is not the legal parent or guardian of such child or who is described in § 36-1-117(b) or (c)

may also be terminated based upon any one (1) or more of the following additional grounds:

\* \* \*

(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;
(v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or
(vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3);

(B)(i) For purposes of this subdivision (g)(9), "notice" means . . . .

(ii) "Notice" also means the oral statement to an alleged biological father from a biological mother that the alleged biological father is believed to be the biological father of the biological mother's child; . . . .

Tenn. Code Ann. § 36-1-113(g)(9) (2010).

With regard to this issue, the Juvenile Court specifically found:

The petition in this cause was filed on May 31, 2012, almost a year after [Father's] meeting with the child's case manager. [The Child] was almost two years old. By then [Father] certainly knew he was the child's father. DNA testing had been completed and he was aware of the results before the case manager's visit the previous year. Yet he took no steps to establish a legal relationship with the child. [Father] asserts that he could not do anything to claim paternity because he was incarcerated. As evidenced by his participation in this case, [Father] is certainly capable of writing letters and filing pleadings. He asked the child's mother to put his name on [the Child's] birth certificate. When she refused, he did nothing more to assert his parental rights. Thus, when the Department's petition was filed he was still not the child's legal parent.

\* \* \*

7. However, the Court does find, upon these facts, that:

a. [Father] failed to file a petition to legitimate the child within thirty (30) days after notice of alleged paternity by the child's mother.

b. [Father] has failed to manifest an ability and willingness to assume legal and physical custody of this child. He remains in prison with only his assertion that he will be released in the near future. He is certainly not able to assume custody of this child no matter how willing he may be. Parole is uncertain at best. The Court has no idea how long after that it would take [Father] to provide a suitable home. For children, time is of the essence.

c. Awarding legal and physical custody of the child to [Father] would pose a risk of substantial harm to the physical or psychological welfare of the child. [The Child] was seriously traumatized and abused as an infant. Her foster parents have nurtured her through her recovery and provided her with the security and stability that has allowed her to blossom and thrive. Removing her from that home to place her with [Father] would certainly risk everything.

In his brief on appeal Father states that his "uncontroverted testimony expressed his desire to raise his children as soon as he is released from prison," and argues that this Court should not conclude the analysis once "they become aware that parent is incarcerated," but should "consider the resources available to the parent, the conduct of the inmate while incarcerated, as well as the interaction with the child(ren) prior to the incarceration."

A careful and thorough review of the record on appeal reveals that the Juvenile Court did consider the resources available to Father while in prison, Father's conduct while incarcerated, and Father's interaction with the Child. The record reveals that Father took no steps to avail himself of the only program available to him in prison until some time after Ms. Daugherty had met with him to explain the Parenting Plan. The record also reveals that Father jeopardized his chances of being accepted into the therapeutic community program through his own actions by incurring multiple class A disciplinary infractions while incarcerated. Father admitted that he had infractions for such things as possession of a phone, possession of marijuana, and possession of a knife, among other things. The record reveals that Father never has had contact of any kind with the Child. Furthermore, the record reveals that Father took no steps to establish a legal relationship with the Child despite being told by Ms. Daugherty and Mr. Hall that he needed to ask for an attorney. The record also reveals that Father knows how to write letters and file pleadings and that Father has been able to be in contact with an attorney in connection with his criminal charges. The record reveals

that Father has been denied parole and, at the time of trial, had more charges pending against him.

Although Father testified that he had a desire to raise the Child, Father's actions belie his words. Ms. Daugherty met with Father and explained the Parenting Plan to him. Father was required under the Parenting Plan to take advantage of programs available to him in prison. Father testified that he signed up for the only available program, but that incurring disciplinary infractions would delay his acceptance into the program. Father's disciplinary record shows that Father incurred multiple class A infractions and a number of class B and C infractions while in prison. Father's disciplinary record introduced at trial showed infractions for actions such as possession of a cell phone, tampering with security equipment, destroying state property, fighting, possession of intoxicants, and possession of a deadly weapon, among other things. Father himself testified that he learned that the Child's mother was pregnant with his child while he was "in jail, . . . on my way to prison . . . ." Thus, Father has known that he at least potentially was the Child's father since the beginning of his current incarceration. The fact that Father is the Child's biological father was confirmed by DNA testing prior to Ms. Daugherty meeting with Father in prison on June 14, 2011 to discuss the Parenting Plan. The record reveals that even after his meeting with Ms. Daugherty, Father continued to incur disciplinary infractions, some of which were class A infractions. Father's actions simply do not manifest an ability and willingness to accept legal and physical custody of the Child, his current incarceration notwithstanding. The evidence in the record on appeal does not preponderate against the findings relative to this issue made by the Juvenile Court by clear and convincing evidence.

Finally, we consider whether the Juvenile Court erred in finding that clear and convincing evidence existed that it was in the Child's best interest for Father's parental rights to be terminated. With regard to this issue the Juvenile Court specifically found:

> [Father] has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in his home. He has no home at this time; he remains in prison. Due to his own conduct, [Father] has not been able to maintain regular visitation or other contact with the child (whom he has never seen) and no relationship at all has otherwise been established between [Father] and the child. A change of caretakers and physical environment is likely to have a detrimental effect on the child's emotional and psychological condition.

* * *

-16-

The child is entitled to a safe, secure and loving home. As noted above, she appears to have fully recovered from her traumatic injuries and is thriving in her prospective adoptive home. [Father] has never had a job; he has never had a home; he has completed nothing in prison (not even his GED) and he faces additional charges in another jurisdiction once he is released from his current incarceration. It would be devastating to this child to remove her from the only family she really knows.

The evidence in the record on appeal does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence.

Given all of the above, we find and hold that grounds for terminating Father's parental rights to the Child were proven by clear and convincing evidence, and that it was proven by clear and convincing evidence that it was in the Child's best interest for Father's parental rights to be terminated. We, therefore, affirm the Juvenile Court's termination of Father's parental rights to the Child.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, Christopher W.C.

_____
D. MICHAEL SWINEY, JUDGE